Cereatha **SMITH**, Plaintiff,

v.

**DATACARD CORPORATION**, a Delaware corporation, and **Jack Reher**, an individual, Defendants.

No. CIV. 3–96–1015.

United States District Court,
D. Minnesota,
Third Division.

June 24, 1998.

---

1070

Jerrod Myron Smith, Kenneth U. Udoibok, Smith & Udoibok, Minneapolis, MN, for Plaintiff.

Barbara Jean D'Aquila, Patrick R. Martin, Cosgrove, Flynn & Gaskins, P.L.L.P., Minneapolis, MN, for Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court upon Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Based on the record and the arguments of the parties, the Court determines that Defendants' motion should be granted in part and denied in part.

## BACKGROUND

Plaintiff Cereatha Smith is an African–American woman who worked as an evening janitor for Defendant DataCard Corporation ("DataCard") from June 22, 1992, until her termination on June 12, 1996. DataCard is a security company that is incorporated in Delaware and is principally located in Minnetonka, Minnesota. Defendant Jack Reher

was Smith's supervisor at DataCard during the entire term of her employment.

From 1993 until her termination, Smith claims that DataCard employees subjected her to continuous sex and racial discrimination and harassment. (*See* Smith Aff. ¶ 14.) Smith asserts that the harassment intensified after she began complaining to Reher in 1994 about the conduct of three fellow DataCard employees: Scott Lindberg, Tony Case, and Darin Clark. (*See id.*) Smith makes a variety of allegations concerning these three employees. These allegations are outlined below.

Smith asserts that Lindberg, Case, and Clark smoked and sold marijuana on Data-Card premises. (*See id.* ¶¶ 17, 18.) Smith claims that she reported this activity to Reher in 1995, but that no action was taken. (*See id.* ¶¶ 19, 20.) Moreover, all three men allegedly threatened Smith and her family after she told Reher about their conduct. (*See id.* ¶¶ 17–21.) Specifically, Smith alleges that Case and Clark threatened to rig her car so that it would crash. (*See id.* ¶ 19.) The two men also allegedly vandalized her car, although she admits that she did not witness it. (*See* Smith Dep. at 683.) Smith further alleges that they told her to keep quiet or else they would hire someone to kill her. (*See* Smith Aff. ¶ 19.)

On one occasion, Case allegedly brought a handgun to work and fired it inside the building. (*See id.*) At the time he fired the gun, Smith was walking down the hallway on the opposite side of a closed doorway from the area where Case was standing. (*See id.*; Smith Dep. at 710, 732) Upon hearing the noise of the gunshot, Smith proceeded to open the door and joined the group in conversation for about ten minutes. (*See* Smith Dep. 710–11, 731.) Smith further testified that Case could not have seen her prior to firing the gun, that the shot was not fired at the hallway door through which she came, and that Case never pointed the gun at her or threatened her during the conversation. (*See id.* at 730–33.) On another occasion, in 1996, Case allegedly followed Smith in his truck as Smith was driving home after work. (*See* Smith Aff. ¶ 21.) Smith claims that she felt threatened and nearly lost control of her car as she sped to get away. (*See id.*) Smith maintains that "[m]any other incidents

of threats occurred" while she was a Data-Card employee, but that she "will limit to the above-referenced incidents until trial." (Pl.'s Mem. Opp'n at 5.)

Smith also asserts that she was subject to physical abuse during her employment tenure. She claims that in 1995 Lindberg mixed chemicals in her cleaning bottle several times. (*See* Smith Aff. ¶ 28; Smith Dep. at 647.) On one occasion, Smith maintains that when she used the bottle it caused a burning irritation to her eyes and skin, and that her nose bled. (*See* Smith Aff. ¶ 28; Smith Dep. at 652–53.) She admits, however, that she never saw Lindberg mix her chemicals; instead, Smith claims that Clark told her. (*See* Smith Dep. at 647.)

In addition, on one occasion Smith received an electrical shock from her vacuum cleaner. She claims that the shock resulted from Lindberg purposefully tampering with it. (*See id.*) Again, there were no eyewitnesses, but Smith claims that she learned the identity of the vandal from Case and Clark. (*See id.*) Lindberg denies any knowledge of involvement. (*See* Lindberg Dep. at 47–48.) Moreover, Case and Clark deny relaying this information to Smith, or having any knowledge about the alleged incident. (*See* Clark Dep. at 66, 67; Case Dep. at 34.) Finally, Smith claims that on at least two occasions, in 1995 and 1996, Lindberg urinated in Smith's workgloves and spat on her cleaning supplies. (*See* Smith Aff. ¶ 32.) Again, Smith claims that she reported these events to Reher, but that he took no action. (*See id.*)

Smith further claims that she was subjected to continual harassment and discriminatory conduct because of her race and gender. Smith contends that Lindberg, Case, and Clark regularly used foul language when addressing her. (*See id.* ¶ 15.) Specifically, Smith claims that Lindberg referred to her as "bitch" throughout their employment relationship. (*See id.*) However, in her deposition, Smith states that Lindberg called her "bitch" on three occasions. (*See* Smith Dep. at 580–81.) Each time she reported the event to Reher. (*See id.* at 580–603.) After the third time, Lindberg never addressed her

in that manner again. (*See* Smith Dep. at 603.)

Smith also claims that she was often called "nigger" by fellow employees. (*See* Smith Aff. ¶ 15.) Again, in her deposition, Smith stated that Case and Lindberg used the word only on particular occasions. (*See* Smith Dep. at 841–43, 845, 855, 861.) Specifically, Smith testified that Case used the word "three or four times." (*Id.* at 843, 861.) As for Lindberg, Smith stated that he used the word to address her "at least two times." (*Id.*) Moreover, she testified that Lindberg called her a "nigger bitch" several times in the course of one evening in 1995. (*See id.* at 855.) Smith spoke with Reher on three or four occasions, complaining about the language. (*See id.* 878–79.) Reher called a meeting of the night cleaning crew and informed them that the name-calling and racial slurs needed to stop. (*See id.* at 880.) He also shifted the schedule of a co-worker, Jim Benimon, so that he could attend to any issues that might arise. (*See id.* at 871–72, 880.) After that point, Lindberg and Case did not use racial epithets. (*See id.* at 877.)

Lindberg, Case, and Clark allegedly talked about sexual matters "all the time." (*See id.* at 957.) These comments included persistent references to engaging in sex, asking Smith about her sexual activity, and commenting about Smith's bust size. (*See id.* at 954–59.) In addition, the men allegedly touched their private parts through their clothing in Smith's presence. (*See id.* at 959–60.) Smith discussed this conduct with Reher. (*See id.* at 963, 966.) At a staff meeting, Reher told the three men to stop their conduct. (*See id.* at 966.) Thereafter, the men did not talk about sexual matters with Smith. (*See id.* at 967.)

Lindberg also allegedly engaged in other conduct that Smith found offensive. Specifically, Lindberg allegedly: once told Smith to "kiss his big white ass"; took food from Smith's lunch pail without her permission; and discussed Smith's menstrual cycle. (*See id.* at 654–55, 663–73, 954–56.) Lindberg moved to the day shift on March 17, 1995. (*See* Lindberg Dep. 29, 100.)

In addition, Smith alleges that Lindberg, Case, and Clark grabbed her breasts "on many occasions." (*See* Smith Aff. ¶ 22.) Moreover, she claims that these men would simulate sexual acts in her presence. (*See id.*) Smith asserts that she reported these lewd acts to Reher, but that he did nothing. (*See id.*)

Smith maintains that she developed pain in her wrists and hands in the spring of 1996. (*See id.* ¶ 9.) Smith alleges that she asked Reher to accommodate her condition by placing weight restrictions on the amount she could lift, but that he refused to act. (*See id.*) At one point, when Smith complained to Reher about her condition, he allegedly responded by stating: "If you can't cut the mustard, leave." (*Id.*) Smith claims that the only help she received was the voluntary assistance of a co-workers, Jim Benimon and Georgia Jensen. (*See id.*; Smith Dep. at 976–77.)

In May 1996, Smith informed Reher and DataCard that she would be undergoing surgery for carpal tunnel syndrome in her right wrist. She requested short-term disability and Family and Medical Leave, which Data-Card approved. (*See id.* at 923.) Smith's last day of work was on June 4, 1996, and she underwent surgery the following day. (*See id.*)

Around that same time, information about Smith's alleged alcohol use on the job came to the attention of Lynnette Phenix, a human resources employee at DataCard. Phenix learned about the situation in late May 1996 from Sharon White. (*See* Phenix Aff. at ¶ 6.) White, who is African–American, worked as a night computer operator for DataCard. (*See* id. ¶ 5; White Dep. at 47.) White had reported to her supervisor that she suspected five employees from the night cleaning crew drank while on the job, including: Smith, Benimon, Case, Clark, and Tony Wolfe. (*See* White Dep. at 47.) Of those, Smith and Benimon were the only employees that White eye-witnessed with alcohol while inside the DataCard building. (*See id.* at 48.) During Phenix's investigation, the information about Smith and Benimon was corroborated by another night crew employee, Georgia Jensen. (*See* Phenix Aff. ¶ 11.) No other employees interviewed during the investigation had first-hand knowledge of alcohol or drug use on DataCard premises. (*See id.* ¶¶ 10–12,

16.) During the initial phase of Phenix's investigation, Reher was not contacted because it was unknown whether his performance as a supervisor was at issue. (*See id.* ¶ 7.)

After reviewing the information and consulting with DataCard's legal department, DataCard decided to terminate Smith and Benimon. (*See id.* ¶ 16.) In addition, Clark was given a five-day suspension for an unexcused absence. (*See id.* ¶ 20.) Both Smith and Benimon were terminated on June 12, 1996, during separately conducted meetings. (*See id.* ¶¶ 18, 19.) On the day of her termination, Reher allegedly called Smith and asked her to attend a "lynching meeting." (*See* Smith Aff. ¶ 27.) Present at Smith's termination meeting were Smith, Reher, Phenix, and Frank Kaiser, who was Reher's immediate superior. (*See* Phenix Aff. ¶ 18.) Smith was told that she was being terminated for violating company policy by drinking alcohol while at work. (*See id.*) During a subsequent staff meeting, the night cleaning crew was informed of the terminations. (*See id.* ¶ 21.)

After her dismissal, Smith filed two charges with the EEOC. Smith first filed a charge alleging disability discrimination on June 26, 1996. She filed a second EEOC charge on October 1, 1996, alleging sex and race discrimination. Smith received "right to sue" letters from the EEOC for the disability charge on August 15, 1996, and for the sex and race discrimination charge on October 1, 1996.

Smith filed the instant action in federal court on November 4, 1996. The sixteen-count Complaint contains claims based on a litany of statutes, doctrines, and theories. Smith seeks actual and trebled compensatory damages, civil penalty, attorney's fees and costs, and punitive damages. The parties previously came before the Court on Defendants' motion to dismiss various counts for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). In the alternative, Defendants moved the Court for an order that Smith provide a more definite statement pursuant to Rule 12(e). The Court granted in part and denied in part Defendants' motion to dismiss, and denied the motion for more definite statement. Defendants now come before the Court seeking summary judgment on the remaining counts and claims. The Court turns to resolving the issues raised in the motion.

## DISCUSSION

### A. Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court determines materiality from the substantive law governing the claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *See id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *See id.* at 248–49, 106 S.Ct. 2505.

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548. The Court will grant summary judgment if, "viewing the evidence in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences to be drawn from that evidence, the movant is entitled to judgment as a matter of law." *Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1324 (8th Cir.1991). A district court, however, "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *White v. McDonnell Douglas Corp.,* 904 F.2d 456, 458 (8th Cir.1990) (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied sub nom., Superior Roll Forming Co. v. InterRoyal Corp.,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)). The Court reviews the present motion with these standards in mind.

## B. Analysis

### 1. *Discrimination in Violation of the Family Medical Leave Act*

In Count I of her Complaint, Smith alleges that DataCard violated the Family and Medical Leave Act ("FMLA"), 28 U.S.C. §§ 2601–54, by terminating her because she requested medical leave. (*See* Compl. ¶ 30.) The FMLA requires that an employer provide up to twelve weeks of leave to qualifying employees with serious health conditions. *See* 29 U.S.C. § 2612(1)(D). An employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a)(1). Moreover, the statute prohibits an employer from discriminating "against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2). Data-Card argues that Smith's FMLA claims must be dismissed because DataCard approved her request for leave and has failed to provide any evidence of a discriminatory motive in its decision to terminate her. In response, Smith contends that Defendants took adverse action against her by terminating her employment and by conducting a "lynching meeting" around the time that she was to take medical leave. (*See* Pl.'s Mem. Opp'n at 9.)

The Eighth Circuit has not yet articulated how district courts are to analyze discriminatory discharge claims under the FMLA. The parties offer various analytical methods utilized by courts in other jurisdictions. Smith argues that the Court should adopt the technique used by the Seventh Circuit, which requires determining "whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims." *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 713 (7th Cir.1997). This approach, however, applies only to substantive claims under the FMLA, which is not the focus of Smith's allegations. In her Complaint, Smith alleges that the termination was discriminatory. (*See* Compl. ¶ 30.) Therefore, the Court finds that the *Diaz* test is inapplicable here.

■ Analysis of a discrimination claim under the FMLA requires consideration of the employer's motivation. *See Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th Cir. 1998). In that context, the Eleventh Circuit has held that, in order to make out a prima facie case, a plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir.1997); *see also Dodgens v. Kent Mfg. Co.,* 955 F.Supp. 560, 566 (D.S.C.1997). Alternatively, other courts follow a four-part test for determining whether a plaintiff has established a prima facie case, requiring proof that: (1) plaintiff is a member of a protected class, i.e., qualifying for FLMA rights; (2) adverse action; (3) plaintiff is qualified for the position; and (4) more favorable treatment of employees not exercising FLMA rights. *See, e.g., Petsche v. Home Fed. Sav. Bank, N. Ohio,* 952 F.Supp. 536, 538 (N.D.Ohio 1997).

■ Without deciding which test should control, the Court finds that Smith's claim fails both modes of analysis. As to the first test, Smith has provided no direct evidence of a causal connection between her medical leave of absence and her termination. Moreover, the only circumstantial evidence that she provides is the fact that the termination occurred while she was on medical leave. Without more, coincidental timing is insufficient to create a genuine issue of material fact regarding DataCard's motivation in this case. *Cf. id.* at 538–39 (determining that genuine issue of material fact existed when timing of employment decision was coupled with "other facts").

Alternatively, under the second test, Smith fails to provide evidence that more favorable treatment was granted employees not exercising FLMA rights. Here, both Smith and Benimon were fired. Benimon, however, had not requested FLMA leave. Furthermore, Smith admits that other DataCard employees were granted medical leave without being fired. In short, Smith fails to provide adequate evidentiary support for her FLMA claim. The Court concludes that no reasonable jury could find that DataCard fired Smith for exercising her FLMA rights. Therefore, the Court dismisses Count I.

### 2. Discrimination in Violation of the Americans with Disabilities Act

 DataCard next argues that judgment should be entered as to Count II, which states a claim that DataCard violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213. The ADA proscribes discrimination against a qualified individual with a disability because of the disability. *See* 42 U.S.C. § 12112(a). Federal courts analyze disability discrimination claims by using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, a plaintiff has the initial burden of establishing a prima facie case. *See Price v. S–B Power Tool,* 75 F.3d 362, 364–65 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996). A prima facie case consists of three elements: (1) plaintiff is a "disabled" person within the meaning of the statute; (2) plaintiff was qualified for her position; and (3) plaintiff suffered an adverse employment action "under circumstances from which an inference of unlawful discrimination arises." *Aucutt v. Six Flags Over Mid–Am., Inc.,* 85 F.3d 1311, 1318 (8th Cir.1996). As discussed more fully below, Smith's ADA claim must be dismissed because she fails to provide evidence that creates a genuine issue with respect to the threshold requirement, i .e., establishing that she is disabled under the ADA.

The term "disability" means a physical or mental impairment that "substantially limits one or more of the major life activities" of a qualified individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12101(2). While the ADA does not define the term "major life activity," the regulations issued by the Equal Employment Opportunity Commission ("EEOC") to implement the statute does provide guidance. *See Aucutt,* 85 F.3d at 1319. Specifically, the regulations state that the term means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* § 1630.2(j)(3)(i). Instead, the claimed impairment "must prevent the [plaintiff] from performing an entire class or broad range of jobs as compared to the average person possessing comparable training, skills, and abilities." *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1207 (8th Cir.1997) (citing, *inter alia,* 29 C.F.R. § 1630.2(j)(3)(i)). Finally, the following factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment, (2) its duration or anticipated duration, and (3) its actual or expected long-term impact. *See Aucutt,* 85 F.3d at 1319 (citing 29 C.F.R. § 1630.2(j)(2)).

Here, Smith simply fails to provide the court with sufficient evidence about her impairment to preclude summary judgment. DataCard provides the Court with competent medical evidence showing that Smith "does not have a physical impairment that materially or substantially limits one or more major life activities," (Sigmond Report 10/8/97) (Martin Aff. Ex. B), and that she could perform custodial work "without restrictions," (*id.*). In response, Smith states, "I developed carpal tunnel syndrome. I had severe pain in my hand. . . . I continued to use my hands to the point that my cleaning equipment would fall out of my hands." (Smith Aff. ¶ 9.) Smith fails to point the Court to any other evidence in the record tending to establish the nature and severity of the impairment, its duration or anticipated duration, or its long-term impact. The conclusory nature of Smith's affidavit, coupled with the dearth of evidence in the record, "are insufficient to withstand a properly-supported motion for summary judgment." *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir. 1997) (citing *Berg v. Bruce,* 112 F.3d 322, 327–28 (8th Cir.1997); *Herrero v. St. Louis Univ. Hosp.,* 109 F.3d 481, 485 (8th Cir. 1997)); *Aucutt,* 85 F.3d at 1319. Consequently, the Court concludes that Smith is not "disabled" within the meaning of the ADA, and grants DataCard's motion for summary judgment on Count II.

### 3. Sex Discrimination

In Counts III and IV, Smith asserts claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")

and the Minnesota Human Rights Act ("MHRA"). Specifically, Smith pursues her claims under a hostile work environment theory and a theory of disparate treatment. DataCard argues that Smith has failed to offer evidence sufficient to avoid judgment on these two counts. As discussed more fully below, the Court grants DataCard's request for summary judgment on Smith's disparate treatment theory, but denies the motion as to her claim under the hostile work environment theory.

■ First, Smith contends that her sex discrimination claims survive summary judgment on a theory of disparate treatment. On that theory, she alleges that DataCard's decision to terminate her was motivated by gender-based animus. Smith, however, offers no direct evidence of DataCard's purportedly discriminatory motive. Moreover, DataCard provides a legitimate nondiscriminatory reason for Smith's discharge-her violation of company policy by possessing and using alcohol on DataCard premises. Thus, under the familiar *McDonnell Douglas* burden-shifting model, Smith must establish both a prima facie case of sex discrimination and that DataCard's legitimate reason for discharge was a pretext for sex discrimination. *See Jones v. Frank*, 973 F.2d 673, 675 (8th Cir.1992).

In order to establish a prima facie case, Smith must prove by a preponderance of the evidence that she is a member of a protected class who was qualified for employment but was denied it, while similarly situated employees outside her protected class were treated differently. *See id.* at 676. Here, Smith's argument concerning her prima facie case consists of a single paragraph:

> Plaintiff is a member of the protected class—African–American. Plaintiff was qualified for the position. Defendants cannot say that Plaintiff was unqualified for the position she held since 1992. Besides, Defendants have admitted that Plaintiff performed her job well. No other white male was treated in the manner that Plaintiff was treated. Tony Case, Darin Clark and Scott Lindberg to name a few were not treated in the same manner. These adverse employment actions culminated into [sic] Plaintiff's termination.

(Pl.'s Mem. Opp'n at 16.) Without dwelling on the irrelevance of Smith's race in the context of sex discrimination, these conclusory allegations are wholly inadequate to establish a prima facie case. The most glaring omission is the failure to prove dissimilar treatment, which is the heart of Smith's claim under this theory. Her only circumstantial evidence consists of the fact that several male employees were not fired despite White's reported suspicions that they were using alcohol. Smith, however, admits that Benimon, a male employee, was also terminated for alcohol use. Moreover, Smith attempts to dodge the undisputed fact that DataCard investigated White's charges and found that no other night-shift employee, besides Smith and Benimon, was seen drinking alcohol by two individuals. Without further proof of discrimination, the Court finds that Smith has failed to prove a prima facie case of discrimination under a disparate treatment theory, and that she has failed to prove that the reason given for her discharge was pretextual. Therefore, DataCard is entitled to summary judgment dismissing her claim under this theory.

■ Second, Smith claims that her sex discrimination allegations survive summary judgment under a hostile work environment theory. Sex discrimination that has created a hostile or abusive working environment violates Title VII. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To prevail on a sex discrimination claim based on a hostile work environment, a plaintiff must show "(1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a 'term, condition, or privilege' of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1013 (8th Cir.1988) (quotations omitted).

■ In this case, Smith recounts numerous instances of sexually-charged statements and conduct, directed at her, throughout the tenure of her employment. Smith claims that she found this unwelcomed conduct offensive, and repeatedly complained to her supervisor about it. In some instances, Re-

her allegedly did take action at her behest, but on other occasions he did not intervene. The alleged conduct, in its various forms, continued to occur until her termination. Based on these allegations, Smith has proffered sufficient factual support for her charges against DataCard to survive summary judgment. Therefore, the Court denies the motion to dismiss Counts III and IV, and finds that a genuine issue of material fact exists regarding Smith's sex discrimination claims under a hostile work environment theory.

In response, DataCard argues that Smith's claims are time-barred. In particular, DataCard bases its argument on a single statement in Smith's testimony, i.e., that all three employees were present when certain sexual comments were made. (*See* Smith Dep. at 957–58.) DataCard, however, narrowly construe this statement to mean that no harassment could have occurred after Lindberg moved to the day shift in March 1995, since he could no longer have been present, as purportedly described by Smith. The Court, however, does not read that single statement without the broader context of the entire record. Smith has alleged numerous acts of sexual harassment, including statements, tauntings, and physical acts. On summary judgment, Smith's single statement about who was present cannot be construed as a fatal contradiction to the remainder of her allegations. The Court could easily construe the statement to mean that the sexual harassment was perpetrated by one of these three individuals, as opposed to occurring when all three were present. In short, DataCard attempts to make too much of this statement.

■ In addition, DataCard contends that Smith's allegations fail to establish a sufficiently pervasive pattern of unwelcomed sexual harassment. DataCard correctly points out that a plaintiff must prove "more than a few isolated incidents of harassment," *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir.1983). Here, Smith provides specific examples of recurring offensive sexual conduct that spanned years. These allegations are sufficiently numerous to create a genuine issue of material fact regarding a statutory violation.

Finally, DataCard claims that Smith cannot prove that it failed to take proper remedial action. While Smith testifies that on some occasions Reher responded to her complaints, on other occasions he allegedly did not. Based on these allegations, Smith raises a genuine issue of material fact as to whether DataCard took proper action in response to Smith's numerous complaints about sexual harassment. Consequently, the Court denies DataCard's motion for summary judgment on Smith's sex discrimination claims under a hostile work environment theory.

### 4. *Race Discrimination*

Counts V, VI, and VII contain allegations that Defendants discriminated against Smith on the basis of her race in violation of 42 U.S.C. § 1981, Title VII, and the MHRA, respectively. As with her sex discrimination claims, Smith pursues her charges of race discrimination under two theories: disparate treatment and hostile work environment. Defendants assert that these counts must be dismissed since Smith fails to support her allegations with adequate evidence of race discrimination. In this instance, the Court agrees with Defendants.

■ In Count V, Smith alleges that Defendants' discriminatory conduct violated 42 U.S.C. § 1981. Among other things, section 1981 protects individuals from racial discrimination in the context of making and enforcing contracts. 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is defined to include "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To recover damages under section 1981, a plaintiff must establish that: (1) the plaintiff is a member of a racial minority; (2) defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, e.g., to make and enforce contracts. *See Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413, 1432 (N.D.Iowa 1994). As with claims under Title VII and the MHRA, section 1981 requires proof of intentional discrimination. *See id.* In essence, the elements of a section 1981 claim in the employment setting are the

same as those of disparate-treatment, race-discrimination claims under Title VII and the MHRA. *See id.* Therefore, the Court analyzes Smith's allegations of discrimination in Counts V, VI, and VII utilizing the *McDonnell Douglas* burden-shifting scheme. *See id.; Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

■ Smith bases her disparate treatment claims on the theory that her termination was motivated by racial animus. To establish a prima facie case of race discrimination in employment, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job that he or she was performing; (3) the plaintiff suffered adverse employment action, or was discharged; and (4) a non-member of the protected class replaced the plaintiff or was not subjected to the adverse employment action. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Here, Smith's proof of discrimination is lacking. In support of her prima facie case, Smith's argument consists of the following paragraph:

> Plaintiff is an African–American and a member of a protected class. Plaintiff was qualified for the position because she held it for years until her termination. Plaintiff [sic] similarly situated whites were treated differently: Scott Lindberg, Darin Clark, and Tony Case. Plaintiff suffered adverse employment action by her firing.

(Pl.'s Mem. Opp'n at 18.) Smith also notes Reher's alleged description of her termination meeting as a "lynching meeting." These allegations, however, fail to provide the necessary factual support to establish the third and fourth elements of a prima facie case.

■ In the context of employment termination, when discriminatory comments are "vague and remote in time and administrative hierarchy, they are not more than 'stray remarks,' which are insufficient to establish discrimination." *Guthrie v. Tifco Indus.,* 941 F.2d 374, 379 (5th Cir.1991); *see also EEOC v. MCI Telecomm. Corp.,* 820 F.Supp. 300, 309 (S.D.Tex.1993). Under the *McDonnell Douglas* analysis, stray remarks, statements

by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process are insufficient to establish a prima facie case. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 276–78, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). While the alleged racial slurs themselves were repugnant and inappropriate, the evidence indicates that they were infrequent and sporadic events. Moreover, the discriminatory comments came from individuals who were not "decisionmakers" in DataCard's election to terminate Smith.

■ Moreover, Smith's disparate treatment discrimination claims must be dismissed because she fails to prove that similarly-situated white employee were treated differently. Smith's bald allegations, while sufficient to survive a motion to dismiss, fail in the context of summary judgment. Smith provides no evidence about "similarly-situated" white employees. In particular, while Smith contests that two employees eye-witnessed her drinking on the job, she provides no evidence that other white employees were also seen drinking by two employees. Based on this lack of evidence, Defendants' motion for summary judgment must be granted on Smith's race discrimination claims under a disparate treatment theory.

Smith, however, also contends that being subjected to racial slurs constituted a discriminatory work environment. Here, unlike with her sex discrimination claims, Smith fails to make out a prima facie case as she has not adequately bolstered her allegations with sufficient factual support. At best, Smith's allegations of racial harassment entail infrequent, sporadic events which do not violate the statutes at issue here. *See Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981) (" '[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.' ") (quoting *EEOC v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381, 384 (D.Minn.1980)) *see also Gartman v. Gencorp Inc.,* 120 F.3d 127, 131 (8th Cir.1997).

Smith's contention that the racial comments were regular incidents-testifying that

they occurred "regularly" or "frequently"—is simply not supported by her sworn deposition testimony. Specifically, Smith claims that she was often called "nigger" by fellow employees. (*See* Smith Aff. ¶ 15.) However, in her deposition, Smith stated that Case and Lindberg used the word only on particular occasions. (*See* Smith Dep. at 841–43, 845, 855, 861.) Smith spoke with Reher about their language. (*See id.* 878–79.) He called a meeting of the cleaning crew and informed them that the racial slurs must stop. (*See id.* at 880.) He also shifted Benimon's schedule so that he could attend to any issues that might arise. (*See id.* at 871–72, 880.) After that point, Smith admits that Lindberg and Case did not use racial epithets. (*See id.* at 877.)

In addition, Smith fails to establish that the alleged physical threats, pranks, and practical jokes she endured during her employment were motivated by racial animus. In particular, her allegations regarding electrical shock, chemical mixing, lunch box thievery, car vandalism, and the like, have no nexus with Smith's race. *See Williams v. Metropolitan Waste Control Comm'n*, 781 F.Supp. 1424, 1426–27 (D.Minn.1992). Instead, the only reasonable connection is that these acts were in response to Smith's purported complaints about drug use by Case, Clark, and Lindberg. In short, these scattered pieces of evidence, together with conjecture and speculation, fail to create a genuine issue of material fact regarding Smith's race discrimination charges. Consequently, the Court grants Defendants' motion for summary judgment and dismisses Counts V, VI, and VII.

### 5. *Reprisal in Violation of the Minnesota Human Rights Act*

In Count VIII of the Complaint, Smith contends that she was terminated in retaliation for "complaining of unequal treatment for her working conditions," (Compl.¶ 52), in violation of the MHRA, *see* Minn.Stat. § 363.03, subd. 7. The *McDonnell Douglas* framework applies to a reprisal claim. *See Williams*, 781 F.Supp. at 1428. A claim for reprisal requires a plaintiff to show that she participated in a protected activity, that an adverse employment action was taken against her, and that a causal connection exists between the two events.

*See Wiehoff v. GTE Directories Corp.*, 61 F.3d 588, 597–98 (8th Cir.1995); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn.1983). "Protected activity 'includes opposing ongoing discriminatory treatment.'" *Wiehoff*, 61 F.3d at 598 (quoting *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1155 (8th Cir.1989)).

Here, Smith fails to establish a prima facie case of discrimination concerning DataCard's decision to terminate her. In a reprisal claim, the causal connection element "may be demonstrated indirectly by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." *Hubbard*, 330 N.W.2d at 445. Here, Smith's argument is summed up in the following factual observation: "[S]hortly after Plaintiff complained about discriminatory treatment, DataCard needed to remove her from its employment." (Pl.'s Mem. Opp'n at 19.) Smith's contention, however, completely contradicts her sworn testimony that she had complained to Reher about her treatment for years prior to her termination. In addition, it ignores the undisputed fact that Reher was not a decisionmaker with respect to her termination, and that DataCard conducted an investigation prior to reaching its decision. With no other evidence of a causal connection or of pretext, no genuine issue of material fact exists and her reprisal claim must fail. Consequently, the Court grants DataCard's motion and dismisses Count VIII.

### 6. *Aiding and Abetting Discrimination in Violation of the Minnesota Human Rights Act*

In Count IX, Smith alleges that Reher aided and abetted unlawful discrimination, in violation of the MHRA. Specifically, Smith asserts that she "was fired for complaining of unequal treatment for [sic] her working conditions." (Compl.¶ 55.) Minnesota Statutes section 363.03, subdivision 6, creates statutory liability for aiding or attempting to aid a person engaging in conduct forbidden by the MHRA. According to Smith, Reher violated the statute by: (1)

refusing "to take proper actions" when Smith accused co-workers of using and selling illegal drugs on DataCard property; (2) ignoring Smith's "frequent" complaints about harassment; (3) calling Smith's termination meeting a "lynching" meeting; and (4) laughing after the conclusion of Smith's termination meeting. (*See* Pl.'s Mem. Opp'n at 20–21.) For the following reasons, the Court finds that these allegations do not create a genuine issue of material fact to preclude summary judgment.

First, the only cognizable violation of the MHRA that Smith has asserted is a claim for hostile work environment sex discrimination. Smith fails to demonstrate how her co-workers' purported drug activity was "conduct forbidden by" the MHRA. Under the plain language of the statute, an aiding and abetting claim arises only if the defendant aided a person engaged in acts prohibited *by the MHRA. See* Minn.Stat. § 363.03, subd. 6. While marijuana use and sale constitutes criminal activity, it is not proscribed by the MHRA. As such, Smith's reference to co-workers' drug activity is irrelevant to her present claim.

Second, and likewise, Smith's reference to the "lynching" meeting is not relevant. This statement could only possibly pertain to race. Since the Court has already found that no violation of the MHRA occurred relating to race discrimination, Reher's alleged statement cannot be considered here.

Finally, Smith has "failed to set forth any specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial" regarding Reher aiding sex harassment. *Moss v. Advance Circuits, Inc.*, 981 F.Supp. 1239, 1248 (D.Minn.1997). Conclusory allegations about Reher's "acquiescence" are insufficient to preclude a properly supported summary judgment motion. Therefore, the Court grants the motion and dismisses Count IX.

### 7. *Negligent Infliction of Emotional Distress*

▮▮▮▮ In Count XII, Smith asserts a claim for negligent infliction of emotional distress. A claim for negligent infliction of emotional distress requires a plaintiff to show that the plaintiff: (1) was in a zone of danger of physical impact; (2) reasonably

feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations. *See K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn.1995). The Minnesota Supreme Court has described the circumstances in which recovery is permitted as follows:

> [These cases] are characterized by a reasonable anxiety arising in the plaintiff, with attendant physical manifestation, from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur.

*Id.* at 558. "A remote possibility of personal peril is insufficient to place plaintiff within a zone of danger ...." *Id.* at 559.

In this case, Smith's claim fail at several levels. To begin with, Smith's evidence does not demonstrate that she was in a "zone of danger" or that she reasonably feared for her safety. Smith argues that several incidents meet the legal requirements of her negligence claim, including: (1) receiving an electrical shock from her vacuum cleaner; (2) being followed down the highway by a co-worker; (3) having her cleaning chemicals mixed together; which, on one occasion, caused an explosion resulting in a nosebleed; (4) hearing a gun shot at work; (5) having her family threatened; and (6) being threatened with rape. (*See* Pl.'s Mem. Opp'n at 21.) However, beyond conclusory statements, Smith provides no support for her contention that, in each of these independent occurrences, she was in a "zone of danger" or reasonably feared for her safety. As noted above, a "remote possibility of personal peril" is legally insufficient to support a claim for negligent infliction of emotional distress. *K.A.C.*, 527 N.W.2d at 559.

Smith's own description of these events reveals that none of them amounted to situations that involved "grave personal peril." For example, with respect to the gun incident, Smith admittedly heard the sound of a gun shot in another room, behind a closed door. (*See* Smith Dep. at 710–11, 731–33.) She then proceeded through the door, walked to the group gawking at the weapon, and entered into a conversation that lasted for an

extended period of time. (*See id.*) In that instance, no reasonable jury could conclude that Smith was in a zone of danger or that she feared for her safety. Moreover, each of the other alleged circumstances is equally infirm and does not warrant further discussion.

At worst, the incidents Smith describes may be characterized as inappropriate, uncivil, and even mildly dangerous. However, they are not the type of physically-risky, calamitous events that a claim for negligent infliction of emotional distress is designed to remedy. *Cf. Okrina v. Midwestern Corp.*, 282 Minn. 400, 165 N.W.2d 259, 261 (1969) (finding plaintiff in zone of danger when she heard "what sounded like a bomb" and witnessing a wall collapse); *Silberstein v. Cordie*, 474 N.W.2d 850, 852–53 (Minn.Ct. App.1991) (finding family in zone of danger when family member murdered in adjacent room); *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438, 440 (Minn.Ct.App.1985) (finding passenger in zone of danger when airplane suddenly rolled and plunged toward earth). Consequently, the Court finds that Smith has failed to establish the first two elements of her claim.

In addition, even if she could establish these elements, Smith does not provide evidence that she suffered "attendant physical manifestations" *of her anxiety.* In particular, Smith admits that she never experienced any physical or mental health problems while working at DataCard. (*See* Smith Dep. at 211, 997.) Instead, she claims that her problems arose after her termination. (*See id.* at 211–12.) Moreover, Smith's contention that she suffers nightmares and is tense and fearful, do not satisfy the physical manifestations test. *See Leaon v. Washington County*, 397 N.W.2d 867, 875 (Minn.1986) (finding lost weight, depression, anger, fear, and bitterness do not satisfy test). Thus, Smith cannot prove emotion distress with physical manifestations.

Finally, Smith's claim against Reher fails on independent grounds. A co-employee may be held liable only for acts "constituting direct negligence toward the plaintiff, tortious acts in which he participated, or which he specifically directed others to do. A co-

employee may be held liable when, through personal fault as opposed to vicarious fault, he breaches a duty owed to plaintiff." *Dawley v. Thisius*, 304 Minn. 453, 231 N.W.2d 555, 557 (1975); *see also Wood v. Korn*, 503 N.W.2d 523, 524–25 (Minn.Ct.App.1993). "The duty to provide safe equipment or a safe workplace is a nondelegable duty belonging solely to the employer, and a co-employee cannot be held personally liable for the breach of that duty." *Wood*, 503 N.W.2d at 525. Here, Smith proffers no evidence that Reher personally participated in, or directed others to engage in, the negligent acts cited. In short, Smith fails to establish any of the requisite elements of a claim for negligent infliction of emotion distress against either Defendant, DataCard or Reher. Therefore, the Court grants Defendants' motion and dismisses Count XII.

### 8. *Negligent Hiring and Retention*

In Count XIV, Smith asserts claims against DataCard for negligent hiring and negligent retention. Minnesota recognizes both of these common-law tort theories. *See Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 910 (Minn.1983). While negligent hiring and negligent retention are closely related, Minnesota courts treat them as distinct theories of recovery. *See Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 423 (Minn.Ct.App. 1993). Therefore, the Court analyzes the merits of each claim independently.

First, in order for liability to attach under the theory of negligent hiring an employer must breach its "duty to exercise reasonable care in view of all the circumstances in hiring individuals who, *because of the employment,* may pose a threat of injury to members of the public." *Ponticas*, 331 N.W.2d at 911 (emphasis added). The *Ponticas* court recognized that the scope of an employer's duty of care hinges on the type of responsibilities associated with a particular job. *See id.* at 913; *Yunker*, 496 N.W.2d at 422. Specifically, the court noted that

[t]he scope of the investigation is directly related to the severity of the risk third parties are subjected to by an incompetent employee.... [O]nly slight care might suffice in the hiring of a yardman, a worker

on a production line, or other types of employment where the employee would not constitute a high risk of injury to third persons . . . .

*Ponticas*, 331 N.W.2d at 913. Here, Smith focuses her attention on one employee in particular, Tony Case. (*See* Pl.'s Mem. Opp'n at 23.) Smith contends that DataCard should have investigated more fully into Case's background. (*Id.*) Therein, it would have found that he was "prone to violence." (*Id.*) The Court does not agree.

■ Smith's argument distorts the scope of duty applicable in this situation. Case, like Lindberg and Clark, was a janitor on the night cleaning crew. The job responsibilities of these night-shift janitors "entailed no exposure to the general public and required only limited contact with coemployees." *Yunker*, 496 N.W.2d at 423. Case's duties "did not involve inherent dangers to others." *Id.* Moreover, Smith was not a "reasonably foreseeable victim" at the time of Case's hiring. *Id.* Considering these undisputed facts and the applicable legal principles, the Court concludes that DataCard did not owe a duty to Smith at the time of Case's hiring, or at the time of hiring any other night crew janitor. Therefore, DataCard is not liable to Smith under a theory of negligent hiring, and that claim in Count XIV must be dismissed.

■ Smith also contends that Data-Card is liable for negligent retention. Under this theory, an employer may be held directly liable for "an employee's intentional tort, an action almost invariably outside the scope of employment, when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct." *Yunker*, 496 N.W.2d at 422. In Minnesota, employment-based sexual harassment may form the basis of a claim for negligent retention. *See Mandy v. Minnesota Mining & Mfg.*, 940 F.Supp. 1463, 1470–72 (D.Minn.1996); *Thompson v. Campbell*, 845 F.Supp. 665, 676 (D.Minn. 1994); *Bruchas v. Preventive Care, Inc.*, 553 N.W.2d 440, 442–43 (Minn.Ct.App.1996); *Kresko v. Rulli*, 432 N.W.2d 764, 769–70 (Minn.Ct.App.1988). General harassment, however, is not enough. *See Bruchas*, 553 N.W.2d at 442. Instead, the employee's conduct must rise to the level of an intentional tort in order to be actionable under the

theory. *See id.* (citing *Oslin v. Minnesota*, 543 N.W.2d 408, 415 (Minn.Ct.App.1996)). Furthermore, Minnesota courts have held that claims for negligent supervision arise only in circumstances involving a threat of physical injury or actual physical injury. *See id.; Leidig v. Honeywell, Inc.*, 850 F.Supp. 796, 807 & n. 13 (D.Minn.1994) (citing additional case law supporting physical injury requirement). *But see Mandy v. Minnesota Mining and Mfg.*, 940 F.Supp. 1463, 1471–72 (D.Minn.1996) (questioning physical injury requirement).

■ Again, Smith's claim fails for lack of proof. Smith admits that she never experienced any physical or emotional problems while working at DataCard. (*See* Smith Dep. at 211, 997.) Therefore, the only basis for an actionable claim is if she establishes a threat of physical injury. However, as previously discussed in relation to her negligent infliction of emotional distress claim, Smith is unable to prove a threat of physical injury here. Based on Smith's own description of the various events she experienced, Smith did not experience a bona fide threat of physical injury. Moreover, no reasonable jury could make such a finding.

Specifically, Smith has no competent proof regarding who, if anyone, caused her vacuum cleaner to give her a shock or who mixed her cleaning chemicals together on the one occasion that resulted in an explosion. In addition, Smith's description of being followed on the highway belies any reasonable belief that physical injury was threatened. Finally, Smith provides no evidence to support her conclusory affidavit statements regarding various threats about rape and threats to her life. In short, Smith simply fails to create a genuine issue of material fact with respect to her claim of negligent retention. Accordingly, the Court grants the motion for summary judgment with respect to Count XIV.

### 9. *Negligent Supervision*

■ In Count XV, Smith states a cause of action against DataCard for negligent supervision. In Minnesota, the Restatement (Second) of Torts section 317 and the Restatement (Second) of Agency section 213 define the scope of negligent supervision. *See Mandy*, 940 F.Supp. at 1471; *Semrad v.*

*Edina Realty, Inc.,* 493 N.W.2d 528, 533–35 (Minn.1992). The Minnesota Supreme Court has described the tort in the following terms:

[T]he entire thrust of section 317 is directed at an employer's duty to control his or her employee's physical conduct while on the employer's premises or while using the employer's chattels, even when the employee is acting outside the scope of the employment, in order to prevent intentional or negligent infliction of *personal injury.*

*Semrad,* 493 N.W.2d at 534 (emphasis added).

Smith's support for her claim is again nothing more than conclusory allegations and hypothesis. Specifically, Smith focuses her attention on the electrical shock that she received from her vacuum cleaner and the nosebleed that she experienced following the alleged chemical mixing episode. Smith's claim must be dismissed for several reasons. First, despite these two experience, Smith testified that she experienced no physical harm during her experience at DataCard. This admission is fatal to her claim. Second, Smith has no competent proof that the vacuum-shock or chemical-mixing incidents were caused by the tortious acts of fellow employees and were not merely accidents incidental to her janitorial duties. Finally, DataCard did exercise reasonable care in these two instances by repairing the vacuum cleaner and providing Smith with her own locked closet for chemicals. Thus, the Court grants the motion and dismisses Smith's claim for negligent supervision.

### 10. *Defamation*

 Finally, in Count XVI of her Complaint, Smith claims that Defendants defamed her. In order to prove a claim of defamation, a plaintiff must establish that the alleged statement was made, that it was communicated to someone other than the plaintiff, that it was false, and that, as a result, the plaintiff's reputation was damaged. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980). The crux of Smith's defamation claim concerns Reher's alleged statements that she was a "troublemaker" and that she was fired for drinking alcohol on DataCard premises. (*See* Pl.'s Mem. Opp'n at 25.) The Court analyzes each comment in turn.

 As a matter of law, Reher's alleged characterization of Smith as a "troublemaker" is not defamation. As one Minnesota court noted, "the term 'troublemaker' lacks precision and specificity … [and] fails to suggest verifiable false facts …." *McGrath v. TCF Bank Sav.,* 502 N.W.2d 801, 808 (Minn.Ct.App.), *modified on other grounds,* 509 N.W.2d 365 (Minn.1993). In this instance, it is indisputable that Reher's "troublemaker" statement merely expresses opinion. Therefore, this Court finds that his comment is not actionable.

 Smith also asserts that Reher told the night crew that she was fired for drinking alcohol. Here too, Smith fails to meet the basic elements of a defamation claim. *See Stuempges,* 297 N.W.2d at 255. Based on a review of the record, Smith does provide proof of publication and falsity. Specifically, she contends that a fellow night crew worker told her about Reher's announcement after the termination. (*See* Smith Dep. at 938.) Moreover, Smith stands by her claim that the accusation was false, i.e., that she never possessed or drank alcohol on DataCard premises. As for damage to her reputation, however, Smith's evidence is nonexistent.

On this last point, Smith provides no argument or evidence that Reher's statement to the cleaning crew damaged her reputation. Instead, she contends that "Plaintiff is now forced to repeat the defamatory statements. The false statement will continue to restrict Plaintiff's employability." (Pl.'s Mem. Opp'n at 25.) This assertion fails to establish damage to reputation for at least two reasons.

First, Smith's contention raises an entirely different claim than that originally presented. The claim of compelled self-publication is a recently adopted exception to the general rule regarding publication in defamation claims, i.e., that plaintiffs could not recover for defamation if they themselves communicated the statement to a third person. *See Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 886 (Minn.1986). In *Lewis,* the Minnesota Supreme Court stated its holding as follows

Accordingly, we hold that in an action for defamation, the publication requirement may be satisfied where the plaintiff was

compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled. *Id.* at 888. Here, Smith confuses this alternative avenue of showing publication as proof of damages. Her argument is erroneous and does not advance her claim.

Second, even if the Court were to recognize Smith's defamation claim as one for self-publication, she has failed to provide proof on that issue. *See Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406, 411 (Minn.1994) (finding plaintiff's evidence inadequate to create a fact dispute when he merely submitted list of thirteen companies with which he interviewed as part of his deposition testimony). Here, Smith's deposition testimony and affidavit is devoid of any proof of self-publication. Not only does she not provide names of companies where she has interviewed, but she also fails to provide evidence of interviewers' names or documentary evidence of job applications or rejection letters. Therefore, the Court finds that Smith has not created a genuine issue of material fact with respect to her defamation claim. Accordingly, the Court grants summary judgment and dismisses Count XVI.

**CONCLUSION**

Once again, the Court comes to the end of its discussion drained of energy and patience. There is no need to summarize the numerous dismissals outlined above. Instead, in an effort to stem a disturbing trend in employment litigation, the Court feels compelled to express again its dissatisfaction with the presentation of this lawsuit. A "shotgun" approach to litigation cannot and will not be tolerated by this Court. Loading lawsuits with theory upon theory, and claim upon claim, does not protect the legal rights of an aggrieved individual. Instead, it merely drags out the litigation process and adds to the cost of an already costly undertaking. Most importantly, it unnecessarily impedes, rather than advances, the timely dispensing of justice. Lawyers have a duty of professionalism to their clients and to the courts. Reasonable evaluation of a client's circumstances and careful analysis of the law are inherent components of that duty. For the practitioner, these principles must never be ignored, or forgotten.

Accordingly, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss and (Clerk Doc. No. 9) is GRANTED in part and DENIED in part;

2. Count I against Defendant DataCard, alleging violations of the Family Medical Leave Act, is DISMISSED WITH PREJUDICE;

3. Count II against Defendant DataCard, alleging violations of the Americans with Disabilities Act, is DISMISSED WITH PREJUDICE;

4. Count V against Defendants Jack Reher and DataCard, alleging violations of 42 U.S.C. § 1981, is DISMISSED WITH PREJUDICE;

5. Count VI against Defendant DataCard, alleging violations of Title VII, is DISMISSED WITH PREJUDICE;

6. Count VII against Defendant DataCard, alleging violations of the Minnesota Human Rights Act, is DISMISSED WITH PREJUDICE;

7. Count VIII against Defendant DataCard, alleging Reprisal in Violation of the Minnesota Human Rights Act, is DISMISSED WITH PREJUDICE;

8. Count IX against Defendant Jack Reher, alleging Aiding and Abetting Discrimination in Violation of the Minnesota Human Rights Act, is DISMISSED WITH PREJUDICE;

9. Count XII against Defendants DataCard and Jack Reher, alleging claims for Negligent Infliction of Emotional Distress, is DISMISSED WITH PREJUDICE;

10. Count XIV against Defendant DataCard, alleging Negligent Hiring and Retention, is DISMISSED WITH PREJUDICE;

11. Count XV against Defendant DataCard, alleging Negligent Supervision, is DISMISSED WITH PREJUDICE; and

12. Count XVI against Defendants DataCard and Jack Reher, alleging Defamation, is DISMISSED WITH PREJUDICE.