Kim HANSEN, Appellant,

v.

ROBERT HALF INTERNATIONAL, INC., Respondent.

No. A10–1558.

Court of Appeals of Minnesota.

April 19, 2011.

Thomas A. Harder, Shawn M. Dobbins, Foley & Mansfield, PLLP, Minneapolis, MN, for appellant.

Dayle Nolan, Julia H. Halbach, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; CONNOLLY, Judge; and RANDALL, Judge.*

## OPINION

CONNOLLY, Judge.

Appellant-employee brought claims against respondent-employer under the MHRA and the Minnesota Parental Leave Act (MPLA) following appellant's termination after she returned from maternity leave. The district court granted summary judgment in favor of the employer, and the employee appeals. We affirm.

## FACTS

### I. Respondent's Business

Respondent Robert Half International, Inc., is a staffing service. Two of its divisions are OfficeTeam and Robert Half Legal (RHL). RHL places attorneys and legal support staff in law firms and other organizations on a temporary and permanent basis. RHL's operations are divided into geographic zones, and its Minneapolis office is part of the Central Zone. The Central Zone also includes offices in Chicago, Dallas, Houston, St. Louis, and Denver.

RHL's Minneapolis office has two teams: the permanent-placement team (perm team) and the temporary-placement team (temp team). Due to the often immediate nature of temporary-placement requests, temp-team employees have less flexible work hours and are required to work from 7:30 a.m. to 5:30 p.m., and later if the client's needs demand it. Perm-team employees typically work from 8:00 a.m. to 5:00 p.m. or 5:30 p.m. Performance of perm-team employees is measured against an average monthly production target; production numbers are based on fees paid by entities using RHL's placement services.

### II. Appellant's Employment

Appellant Kim Hansen began working for respondent as part of its OfficeTeam division in 2004. In 2006, she transferred to RHL's perm team after the birth of her first child due to the perm team's greater flexibility in working hours, so as to manage her daycare schedule. Unlike other perm-team employees, appellant worked from 8:00 a.m. until 3:00 or 3:30 p.m. Appellant was expected to maintain the same production numbers as other perm-team employees.

In January 2008, appellant was promoted from a recruiting manager to a division

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

director. In addition to the placement and marketing responsibilities of a recruiting manager, division directors also supervise other employees on the perm team. Division directors are still expected to meet production numbers. Appellant's production numbers began to decline after her promotion. In March, the number of employees supervised by appellant was reduced. Appellant's numbers continued to decline; she was removed from her position as a division director and returned to being a recruiting manager.

Although appellant's production numbers increased following her demotion, they were still below RHL's expectations for a recruiting manager with appellant's experience. In mid-July, appellant met with her supervisors to discuss her performance. Appellant failed to meet her production numbers that July and August.

## III. Appellant's Maternity Leave

### A. Appellant's Pregnancy

Appellant learned that she was pregnant with her second child in late January and told the branch manager shortly thereafter. At some point, appellant also told the branch manager that she may have medical complications with her pregnancy. Appellant began experiencing pregnancy-related complications around the time of the July performance meeting. The branch manager told appellant that she had the option of taking early leave to address these complications, but appellant declined. Due to these complications, however, appellant worked from home part-time for the last two weeks of her pregnancy. Appellant's second child was born on August 29, a month early.

### B. Appellant's Leave Request

Appellant submitted a leave-of-absence request form on August 10. Appellant filled out section "A," related to requests for short-term medical, pregnancy and workers' compensation disability leave. Section A stated that "[l]eave under [the federal Family and Medical Leave Act (FMLA)] runs concurrently with Pregnancy Disability Leave in some states." Section "B" dealt with requests for leave under the FMLA. The form instructed the employee to select only one type of leave per form.

Respondent's personnel action forms (PAF) identify the types of leave available, i.e., medical, maternity, FMLA, workers' compensation, personal, and military, and identify the documents required for each leave type. On the first PAF regarding appellant's leave, "maternity" is marked under the leave type and documents in the maternity section are selected. Appellant was then sent a letter stating that her "Short Term Disability/FMLA Leave of absence has been processed" and that the leave was effective August 29. The letter indicated that an employee was eligible for up to 12 weeks of "Short Term Disability/FMLA Leave" in a 12–month period, and that a personal leave may be granted at the conclusion of such leave. The letter also stated that "[a]n employee on a personal leave has no guarantee of job reinstatement to any position at the conclusion of a personal leave."

Respondent's Leave of Absence Manual accompanied the letter. The manual states:

9. Position Reinstatement

Upon completion of an approved leave of absence an employee will be reinstated to the employee's former position or a position that is substantially similar to the employee's former position without reduction in pay, benefits or service. *The exception is if the position or substantially similar position ceases to ex-*

*ist because of legitimate business reasons unrelated to the employee's leave.*

The guarantee of position reinstatement following an approved leave of absence expires at the earlier of (a) the maximum time allowed for the applicable leave of absence or (b) if the leave is for the employee's own medical condition, the date of release for return to work set forth in a doctor's note.

There is no guarantee of reinstatement to a former position for an employee on a discretionary personal leave of absence unless a written agreement is signed prior to the commencement of the personal leave.

(Emphasis added.) The manual also includes a section discussing the interrelationship of FMLA leave with other types of leave. The manual provides that the maximum amount of leave time available under both the pregnancy disability and FMLA leaves is limited to 12 weeks in a rolling calendar year and the maximum will be reduced by any prior leaves taken for these reasons.

Due to medical complications, appellant was approved to extend her leave. A second PAF was completed; the marked boxes again only relating to maternity leave. Appellant returned to work on December 1, after more than 13 weeks of leave.

## IV. Economic Downturn

The need for RHL's permanent-placement services decreased dramatically with the economic downturn. Monthly sales from permanent placements decreased by more than 90% between August and December. Although temporary placements were also down, the temp team was not as severely affected. As a whole, the Central Zone experienced more than a 50% decrease in sales between the third and fourth quarters of 2008.

In response, the Central Zone president told the district director to reduce the number of permanent-placement employees throughout the Central Zone. The district director told appellant's branch manager about the impending reductions. The district director, however, determined which positions would be eliminated. In determining which positions would be eliminated, the district director compared the total production of the individual offices within the zone as well as the lowest performing employees in each of these offices. When analyzing individual employees, the district director considered their production numbers for 2008 and the employee's tenure with RHL.

In all, the number of perm-team employees throughout the Central Zone was reduced from 20 to 8. The perm team in Minneapolis was reduced from four employees to one. The perm teams in two other Central Zone offices were eliminated entirely the month following appellant's termination. The remaining perm-team employees had their salaries reduced.

## V. Appellant's Return

When appellant returned to work on December 1, she met with the branch manager to discuss jobs the perm team was currently working on, the status of her clients, and the hours she was going to be working. Appellant stated that she would be working the same hours. As of this meeting, the branch manager did not know that appellant's position would be selected for elimination.

The next day, the district director informed the branch manager that appellant's position was being eliminated. The branch manager met with appellant around lunchtime that day and terminated appellant's employment. Afterwards, appellant spoke to her former OfficeTeam supervisor and told him that her position

had been eliminated. Appellant was offered the opportunity to interview for a staffing manager position with OfficeTeam, a position she previously held. Appellant did not pursue this position.

## VI. Legal Action

Appellant sued respondent, alleging sex discrimination in violation of the MHRA and violation of the MPLA based on respondent's failure to return appellant to her former position or a comparable one when she returned from leave. Respondent moved for summary judgment dismissing all counts. In opposing respondent's motion, appellant also moved for partial summary judgment on her MPLA claim.

After a hearing on the motions, the district court granted respondent's motion in its entirety, denied appellant's motion, and dismissed appellant's claims with prejudice. The district court concluded that appellant was not eligible for relief under the MPLA because she did not specifically request leave under the act and, even if she had, appellant's position was eliminated as part of a bona fide RIF and therefore reinstatement was not required.

As for appellant's MHRA claim, the district court concluded that appellant failed to present a prima facie case of discriminatory discharge because appellant could not make the additional showing that her sex was a factor in the decision to eliminate her position in light of evidence that appellant's position was eliminated for a legitimate non-discriminatory reason. The district court likewise concluded that appellant had not shown the RIF was pretext for discrimination. This appeal follows.

## ISSUES

I. Did the district court err in granting summary judgment to respondent on appellant's sex discrimination claims under the MHRA?

II. Did the district court err in granting summary judgment to respondent on appellant's reinstatement claim under the MPLA?

III. Did the district court err in concluding that appellant had not pleaded a claim for retaliation under the MPLA?

## ANALYSIS

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, we consider whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). In doing so, we view "the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). A genuine issue of material fact does not exist "when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997). If an employee fails to establish a prima facie case of employment discrimination, summary judgment in favor of the employer is appropriate. *Rademacher v. FMC Corp.,* 431 N.W.2d 879, 882 (Minn.App.1988).

## I.

The MHRA prohibits discrimination in employment practices on the basis of sex.

Minn.Stat. § 363A.08, subd. 2 (2010). Under the MHRA, sex "includes, but is not limited to, pregnancy, childbirth, and disabilities related to pregnancy or childbirth." Minn.Stat. § 363A.03, subd. 42 (2010).

■ Appellant does not dispute that the *McDonnell Douglas* burden-shifting framework applies to her discrimination claim. "Under that test, the plaintiff alleging a discriminatory employment practice must first make out a prima facie case of discrimination." *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn.2001). Once a prima facie case has been established, the burden "then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. . . . [T]he plaintiff must then put forward sufficient evidence to demonstrate that the employer's proffered explanation was a pretext for discrimination." *Goins v. West Grp.*, 635 N.W.2d 717, 724 (Minn.2001).

■ In general, to establish a prima facie case of discriminatory discharge, a plaintiff "must demonstrate that she (1) is a member of a protected class; (2) was qualified for the position from which she was discharged; and (3) was replaced by a non-member of the protected class."[1] *Id.* (quotation omitted). But it is well established that "[t]he *McDonnell Douglas* elements vary with the circumstances of the alleged discrimination." *Id.* (quotation omitted). When the plaintiff has been terminated as part of a RIF, she must make an additional showing as part of her prima facie case that discriminatory animus was a factor in her termination. *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 324 (Minn.1995).

■ A RIF "occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id.* (quotation omitted). The additional showing is required "because the employer's reason for discharging the employee is not otherwise unexplained." *Id.* If an employee is replaced after her discharge, a RIF has not occurred. *Id.* But an employee "is not replaced when another employee is assigned to perform the [employee's] duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another person is hired or reassigned to perform the [employee's] duties." *Id.* (quotation omitted).

■ Because this additional showing pertains only to situations involving a bona fide RIF, we must first consider whether the district court correctly determined that a RIF in fact occurred. *See id.* While appellant asserts that the district court erred when it determined "as a matter of law" that a RIF occurred, we disagree. Caselaw indicates that the district court must make a preliminary determination on this issue in order to determine which elements of the *McDonnell Douglas* test to apply. *See id.* ("requirements of the prima facie test may vary depending on the circumstances involved"); *cf.* Minn. R. Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . ."). In *Dietrich*, the Minnesota Supreme Court held that, because the additional showing requirement was limited to cases involving a bona fide RIF, the first question before the court had to be whether a RIF occurred. 536 N.W.2d at 324. The supreme court

---

1. Respondent concedes that appellant is a member of a protected class, was minimally qualified for her position, and was discharged.

ultimately concluded that "[a] careful review of the record supports the [district] court's finding that the job responsibilities attendant upon the abolished positions 'were either eliminated or consolidated,'" and, while "an explicit factual finding on the existence of a[RIF] would have been preferable," the district court's findings adequately established that the employer engaged in a true RIF. *Id.* at 325. Thus, we must review the district court's findings to determine whether the record supports the district court's determination that a RIF occurred. *Id.* at 324.

■ In determining that a RIF occurred, the district court cited (1) the more than 90% decrease in sales from permanent-placement sales in the Central Zone between August and December 2008; (2) the decline of RHL's business by more than 50%; (3) the Central Zone president's determination that it was necessary to reduce the number of perm-team employees "[t]o account for this radical decrease in demand" and directive to the district director to determine which positions to eliminate; (4) the reduction of the number of recruiting managers in the Central Zone from 20 to 8; (5) the elimination of two entire offices in the Central Zone; (6) the salary reduction of all perm-team employees; and (7) the fact that the Minneapolis perm team was ultimately reduced from four employees to one. Appellant does not contest that these events took place. We therefore conclude that the record supports the district court's determination that a RIF took place and that business considerations caused respondent to eliminate positions within RHL.

■ Because respondent engaged in a bona fide RIF, appellant is required to show that her sex was a factor in the elimination of her position. *See id.* at 324; *see also Hayes v. U.S. Bancorp Piper Jaffray Inc.*, No. Civ.03–4208 RHK/AJB, 2004 WL 2075560, at *5 (D.Minn. Sept. 16, 2004) (stating that, in RIF situations, MHRA plaintiff must make additional showing that protected status was a factor in termination). This additional showing "may take many forms and is not intended to be overly rigid." *Dietrich,* 536 N.W.2d at 325; *see id.* at 324 (observing additional showing could be made by statistical evidence as well as circumstantial evidence).[2]

■ Appellant argues that evidence of sex discrimination exists because she was demoted two months after respondent learned that she was pregnant; another employee became a division director after appellant was demoted; discriminatory comments were allegedly made by the branch manager; and appellant was terminated the day after she returned from maternity leave.[3]

Taking this proffered evidence in the light most favorable to appellant, we disagree with appellant that these events show that her sex was a factor in her termination. Appellant's demotion, although occurring while she was pregnant, took place four months before the economic downturn that necessitated the RIF. Although another employee did assume the division-director position, this employee took over the position a month after appellant was demoted and two months prior to the economic downturn. *See Hayes,* 2004 WL 2075560, at *12 (employ-

---

2. Appellant states that the district court concluded that only statistical evidence would be sufficient. However, the district court actually stated that appellant "needs to point to statistical *or some other evidence* of systematic discrimination." (Emphasis added.)

3. To the extent that appellant asserts that she "was transferred shortly after she became pregnant the first time," the record reflects that appellant requested this transfer.

ee's assertions that employer added another person to her work unit shortly before she went on maternity leave, she was no longer needed, and her position was eliminated did not support a claim for reinstatement under the FMLA because employer did not know of the impending RIF at the time the additional employee was added).

■ Appellant asserts that the branch manager stated that she "need[ed] to either get rid of [another employee] now or I'll be stuck with her because she is pregnant." However, as respondent points out, this comment was allegedly made in November 2007, more than a year before appellant's termination. Appellant also asserts that, after interviewing a potential new employee, the branch manager stated, "[T]oo bad we can't hire her, because she is great, because she is pregnant." The branch manager contends that her comment was in response to the combination of (1) the candidate volunteering that she was pregnant, (2) the candidate's statement that she did not want to begin work again for a period of time after her child was born, and (3) RHL's immediate need for the position. In any event, this comment took place in October 2007, again more than a year prior to appellant's termination. While the branch manager's comments are cause for concern, the branch manager was not involved in the decision to eliminate appellant's position. The district director made the determination. "Under the *McDonnell Douglas* analysis, stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process are insufficient to establish a prima facie case." *Smith v. DataCard Corp.,* 9 F.Supp.2d 1067, 1079 (D.Minn.1998); *see Diez v. Minn. Mining & Mfg.,* 564 N.W.2d 575, 579 (Minn.App.1997) ("Stray remarks made in the workplace cannot serve as direct evidence of discrimination."), *review*

*denied* (Minn. Aug. 21, 1997). Had these comments come from the Central Zone president or even the district director, appellant's argument might carry more weight. *See Hamblin v. Alliant Techsystems, Inc.,* 636 N.W.2d 150, 154 (Minn. App.2001) (observing fact that discriminatory remark came from top executive "is significant because when a major company executive speaks, everybody listens in the corporate hierarchy" (quotation omitted)).

It is true that appellant was terminated the day after she returned from maternity leave. *See Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1113 (8th Cir.2001) (proximity between negative employment action and employee's disclosure of potentially debilitating condition "warrants concern" in evaluating prima facie case under the Americans with Disabilities Act). Nevertheless, courts "have been hesitant to find pretext or discrimination on temporal proximity alone and look for proximity in conjunction with other evidence." *Id.* at 1114 (citation omitted). And we likewise decline to do so here.

Appellant argues about the calculation of the monthly production numbers and contends that she was not one of the perm team's poorest performing employees. Assuming this is true, such evidence may be relevant to establishing pretext. *See Yates v. Rexton, Inc.,* 267 F.3d 793, 800 (8th Cir.2001) (having established a prima facie case of discrimination, employee can survive summary judgment despite the employer's proffered nondiscriminatory reason for termination if the employee presents evidence creating a question of material fact as to whether the employer's proffered reason is pretextual and a reasonable inference that discriminatory animus was a determinative factor in the adverse employment decision). But we are not yet at the pretext stage. Appellant must first make out a prima facie case

of discrimination. *See id.* Here, appellant's position was eliminated as part of a bona fide RIF and even if appellant was one of respondent's top performers, "there is no question that during downturns in business, competent and capable employees are affected by layoffs." *Hayes,* 2004 WL 2075560, at *7; *see also Groves v. Cost Planning & Mgmt. Int'l, Inc.,* 372 F.3d 1008, 1010 (8th Cir.2004) (in RIF situations, employee's assertion that another employee should have been fired instead questions a reasonable business decision made by the employer, "a decision courts do not second guess").

Finally, appellant has not pointed to any evidence suggesting that other pregnant employees were terminated and the record reflects that none of the other 11 perm-team employees discharged from the Central Zone was pregnant.

Because appellant cannot show that her sex was a factor in the decision to eliminate her position, the district court did not err in concluding that appellant failed to make a prima facie case for sex discrimination under the MHRA and properly granted summary judgment in favor of respondent.

## II.

The district court concluded that appellant's claim for reinstatement under the MPLA failed as a matter of law because she never attempted to invoke the act. We review the district court's construction of a statute de novo. *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). Our first step in statutory interpretation is to determine "whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Id.* (quotation and citation omitted).

Under the MPLA, "[a]n employer must grant an unpaid leave of absence to an employee who is a natural ... parent in conjunction with the birth ... of a child. The length of the leave shall be determined by the employee, but may not exceed six weeks, unless agreed to by the employer." Minn.Stat. § 181.941, subd. 1 (2010). An employee returning from parental leave under section 181.941 "is entitled to return to employment in the employee's former position or in a position of comparable duties, number of hours, and pay." Minn.Stat. § 181.942, subd. 1(a) (2010). The MPLA defines an employee as "a person who performs services for hire for an employer *from whom a leave is requested under section[] 181.94[1].*" Minn.Stat. § 181.940, subd. 2 (2010) (emphasis added). We see no ambiguity here. The plain language of the MPLA states that the employee must request leave under the act. *See id.*

When the meaning of a statute is unambiguous, we are bound to interpret the statutory text according to its plain language. *Brua v. Minn. Joint Underwriting Ass'n,* 778 N.W.2d 294, 300 (Minn. 2010). Appellant requested "maternity leave." When asked at a deposition if she applied for leave under the MPLA, appellant responded: "I'm not sure what you mean. I mean if it was something separate. I'm not sure what you mean, other than applying. I mean I just filled out the paperwork for [respondent]." Appellant argues that she, "like any employee in the State of Minnesota, must simply identify that she requires leave; the employer must determine the particular type." However, appellant does not cite, and we are not aware of, any authority stating that the provisions of the MPLA are invoked absent an employee's specific request for leave under the act, as compared to, for example, leave under the FMLA. *See, e.g., Kobus v. Coll. of St. Scholastica,*

608 F.3d 1034, 1036–37 (8th Cir.2010) (stating employer's duties under the FMLA are triggered when employee provides enough information to put employer on notice that employee may be in need of FMLA leave); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 474 (8th Cir.2007) ("[The employee] is not required to understand when she may take FMLA leave, or to state explicitly that she intends to take FMLA leave, or, indeed, even to know that the FMLA exists. All she has to do is apprise her employer of the specifics of her health condition in a way that makes it reasonably plain that it is serious and tell her employer that this is why she will be absent. Her employer would then have the duty to investigate whether she is entitled to FMLA leave."). The record does not reflect that appellant specifically informed respondent at any time that she was taking leave under the MPLA.[4] Therefore, the district court correctly concluded that appellant's claim for reinstatement under the MPLA fails as a matter of law.

## III.

In opposition to respondent's motion for summary judgment, appellant argued that

**4.** We note that, in general, parents receive greater benefits under the FMLA than the MPLA. *See* 17 Stephen F. Befort, *Minnesota Practice* §§ 6.5 (discussing Minnesota parental leave law), 6.7 (comparing parental leave benefits under state and federal law) (2nd ed.2003). A primary distinction between parental leave under state and federal law is the length of leave available. Employers must provide up to 12 weeks of leave during any 12–month period under the FMLA, whereas employers need only provide up to 6 weeks of leave under the MPLA *unless a longer period is agreed to by the employer. Compare* 29 U.S.C. § 2612(a)(1)(A) (2006 & Supp. III 2010) *with* Minn.Stat. § 181.941, subd. 1. If appellant could prove that she had (1) requested leave under the MPLA and (2) respondent had agreed to extend her MPLA beyond the statutory period of 6 weeks to

respondent had retaliated against her for taking maternity leave by terminating her slightly more than 24 hours after her return to work. When granting respondent's motion for summary judgment, the district court stated that, "[i]nsofar as [appellant] argues that she was discharged in retaliation for the exercise of her rights under the [MPLA], the Court notes that [appellant] failed to plead such a claim in the Complaint," and ruled that no retaliatory-discharge claim under the MPLA was properly before it. Appellant contends that her amended complaint was sufficient to put respondent on notice of a retaliatory-discharge claim under the MPLA, as well as a claim for reinstatement.

The MPLA prohibits employers from retaliating against employees who request or obtain parental leave. Minn.Stat. § 181.941, subd. 3 (2010). However, because appellant did not request leave under the MPLA, she therefore cannot prove retaliation under the act.

## DECISION

Because appellant's position was eliminated as part of a bona fide RIF and

encompass the 13 weeks of leave she did take, appellant would arguably have greater rights under the MPLA. But appellant did not request MPLA leave. By processing appellant's maternity leave request as leave under the FMLA, respondent provided appellant with the most generous length of leave available under the circumstances. Appellant also presumably enjoyed the benefit of continued group health plan insurance coverage under the FMLA as federal law requires an employer to maintain coverage "for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave," whereas the MPLA only requires that the employer make coverage available. *Compare* 29 U.S.C. § 2614(c)(1) (2006) *with* Minn.Stat. § 181.941, subd. 4 (2010).

because appellant could not make a prima facie case of sex discrimination by showing that sex was a factor in her termination, the district court properly granted summary judgment in favor of respondent on appellant's MHRA claim. Likewise, because appellant did not request leave under the MPLA, the district court properly granted summary judgment to respondent on appellant's MPLA claim.

**Affirmed.**